# EXHIBIT B

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**                                                  **SUPERIOR COURT**
                                                                 **C.A. NO.**

---

|  |  |
|---|---|
| **CHERYL A. LEON-MCCORMICK,** | ) |
|  | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
|  | ) |
| **CITY OF REVERE and PAUL** | ) |
| **CAPIZZI, in his individual capacity** | ) |
|  | ) |
| **Defendants.** | ) |

---

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

Cheryl A. Leon-McCormick is a 54-year-old woman who was recently terminated from her position as Assistant City Solicitor with the City of Revere ("Revere" or the "City"), an employer to which she dedicated 16 years of her professional life. Ms. McCormick, during her tenure, was the victim of a campaign of gender-based harassment and discrimination at the hands of Paul Capizzi ("Mr. Capizzi"), the City Solicitor for the City of Revere, which harassment and discrimination was tolerated by the City and encouraged by certain City officials. The City terminated Ms. McCormick without cause after she complained about gender discrimination and harassment, and while she was on *protected* FMLA leave. Her termination was not only based upon illegal discrimination, but was also retaliatory for her complaining about discrimination and for her taking leave pursuant to the federal Family and Medical Leave Act ("FMLA").

## THE PARTIES

1.      Plaintiff Cheryl A. Leon-McCormick ("Ms. McCormick") is an adult Massachusetts resident who resides at 9 Kassiotis Lane, Middleton, Essex County, Massachusetts.

2.      Ms. McCormick was, at all times relevant to this action, an employee of the City of Revere.

3.      Defendant City of Revere ("Revere" or the "City") is a municipality within the Commonwealth of Massachusetts. Its offices are located at Revere City Hall, 281 Broadway, Revere, Suffolk County, Massachusetts.

4.      Defendant Paul Capizzi ("Mr. Capizzi") is an adult Massachusetts resident who resides at 9 Jordan Street, Revere, Suffolk County, Massachusetts.

5.      Mr. Capizzi is the City Solicitor of the City of Revere. At all times relevant to this action, Mr. Capizzi was Ms. McCormick's direct supervisor.

6.      At all times relevant to this action, the City of Revere and Mr. Capizzi were Ms. McCormick's employers.

## JURISDICTION AND VENUE

7.      The Superior Court has jurisdiction over this action pursuant to M.G.L. c. 212 § 3 because this is a civil action for money damages, and there is a reasonable likelihood that recovery by the Plaintiff McCormick will be greater than $50,000.

8.      This Court has jurisdiction over the City of Revere pursuant to M.G.L. c. 258 § 3.

9.      Venue for this action is proper in Suffolk County pursuant to M.G.L. c. 258 § 3 and M.G.L. c. 218 § 1 because the City of Revere is situated within Suffolk County and the actions and events giving rise to the claims herein occurred in Suffolk County.

10.     Ms. McCormick filed a Wage Complaint with the Office of the Massachusetts Attorney General. On December 21, 2023, McCormick received a Right to Private Action letter authorizing her to pursue litigation, which authorization is appended hereto as Exhibit 1.

11.     On December 22, 2023, Ms. McCormick filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (the "MCAD"), pursuant to M.G.L. c. 151B, § 5. She dismissed the MCAD Charge to pursue this action, which dismissal is appended hereto as Exhibit 2.

## FACTUAL BACKGROUND

12.     Ms. McCormick had worked for the City for sixteen years at the time of her illegal termination on November 21, 2023.

13.     Ms. McCormick was the ***only*** female attorney employed by the City at that time.

14.     She started working for the Revere City Solicitor's Office (the "Solicitor's Office") in 2007, when she was hired as a paralegal by Mayor Thomas G. Ambrosino.

15.     Ms. McCormick completed law school, passed the Massachusetts Bar exam and, in 2013, was sworn in as a member of the Massachusetts Bar.

### Gender Discrimination by Paul Capizzi

16.     Despite her bar admission, the City continued to pay Ms. McCormick as a paralegal leading her to file a grievance. She ultimately prevailed in arbitration and, in 2016, her pay was slightly increased.

17.     Despite finally attaining the title to match her duties and responsibilities as a Deputy Assistant City Solicitor, Mr. Capizzi continued to refer to Ms. McCormick as his "assistant". He also required her to process payroll for the Solicitor's Office – including her peer,

Daniel E. Doherty, an Assistant City Solicitor -- and order office supplies – as she did as a Paralegal - despite the availability of administrative employees to handle these tasks.

18.     For years while she processed payroll, Mr. Capizzi instructed Ms. McCormick to record Mr. Doherty's and Mr. Capizzi's weekly payroll hours as 39 hours per week, even though Mr. Doherty would routinely work part-time hours. Ms. McCormick, unlike Mr. Doherty or Mr. Capizzi, was required to account for every hour she was absent from the office.  For example, Ms. McCormick would be required to use her 1-hour lunch break so she could leave work at 4 PM rather than 5 PM to attend law school classes in the evening.

19.     In addition to being assigned administrative and menial tasks, Ms. McCormick was treated much differently from her male peers.

20.     For example, Mr. Capizzi and Mr. Doherty generally took time off as they pleased, rarely using sick or vacation time or accounting for reduced hours. By contrast, Ms. McCormick was required to account for hours she was out of the Solicitor's office and to utilize accrued time off.

21.     On March 26, 2019, Mayor Brian Arrigo promoted Ms. McCormick to the position of General Counsel for the Department of Municipal Inspections ("DMI") with an annual salary of $89,731.

22.     Mr. Capizzi expressed outrage to Ms. McCormick and his peers that Mayor Arrigo had not consulted him prior to appointing a woman to this position and raising her salary.

23.     At some point after her promotion, Mr. Capizzi terminated Ms. McCormick's access to the electronic files used by the Solicitor's Office even though, as a City attorney, she required access to such files.

4

24.     After numerous requests to the IT department and Kim Hanton, Aide to Mayor

Arrigo, and after months of asking Mr. Capizzi for access to the Solicitor's Office's electronic

files, Mr. Capizzi eventually restored access to the City Solicitor database to Ms. McCormick.

25.     Mr. Capizzi's actions were driven by his gender-based *animus* towards Ms.

McCormick, as evidenced in his referring to her, a licensed attorney, as his "assistant"; relegating

to her, the *only* female attorney in the Solicitor's Office, the office payroll duties and other

administrative tasks; and in his disparate treatment of her vis-à-vis his flexibility with Mr.

Doherty's lack of accounting for taking paid time off.

26.     When Ms. McCormick discussed the disparate treatment compared to Mr.

Doherty, she was routinely told by Mr. Capizzi, "I have a deal with Dan. He can work whenever

he wants"

27.     As General Counsel, Ms. McCormick's office was moved across the street from

the Solicitor's Office and organized under the DMI.

28.     In this position, Ms. McCormick effectively managed Revere's M.G.L. c. 40U

program, which allowed Revere to assess fines for violations of rules, regulations, orders,

ordinances, building code, or by-laws related to the use of property for short-term rental,

accessory dwelling units, or regulating housing, sanitary, or snow and ice removal requirements.

29.     Ms. McCormick, who spoke fluent Spanish, was the *only* bi-lingual attorney

working for the City and she was better able to serve Revere's Spanish speaking population more

effectively than any other City Attorney or Solicitor's office staffer.

30.     Ms. McCormick had substantial responsibility and relished her new role. She ran

the City's Safe House Task Force ("SHTF"), directed staff, represented the City at 40U

administrative hearings, appeals in Chelsea District Court, and in Superior Court, and managed public records requests to the DMI.

31.     She also designed the budget, attended budget meetings, signed purchase orders, and had signatory authority, which included, among other things, approval of staff payroll.

32.     At the DMI, Ms. McCormick was afforded independence in using her judgment in executing her responsibilities. She put in very long hours and was allowed to accrue compensatory time for additional work hours she regularly dedicated to her responsibilities.

33.     An emphasis of Ms. McCormick's new position was minimizing the use of outside counsel to save the City money, and she excelled in this regard, saving the City substantial revenue and leading to a significant salary increase for 2020 that finally equalized her pay with her male counterpart, Mr. Doherty. Indeed, her new level of compensation even exceeded his - briefly.

34.     When Mr. Capizzi learned that Ms. McCormick's salary as General Counsel was going to exceed that of Mr. Doherty in 2020, Mr. Capizzi was incensed that a female attorney was going to earn more than the male attorneys.

35.     Ms. McCormick, challenged by Mr. Capizzi, pointed out that her skill set was *at least* equal to that of Mr. Doherty, that she now had greater responsibility than Mr. Doherty and that she had saved the City hundreds of thousands of dollars in uncollected permit fees.

36.     In fact, Ms. McCormick received accolades in the City's FY2022 Annual Budget Report recognizing that "General Counsel sent overdue letters to all applicants of unpaid building permits – generating $300,000+ in revenue."

37.     Nonetheless, Mr. Capizzi angrily vowed to Ms. McCormick that she "will never make more than Dan Doherty."

38.     True to his vow, Mr. Capizzi then used his influence with his friend and colleague Robert Marra, Esq. the Chief of Staff to former Mayor Arrigo, and Richard Viscay, the City's Director of Finance, Auditor, and Budget Director, to secure funds to give Mr. Doherty and himself a pay raise of approximately $25,000 each in additional compensation during fiscal year 2020—the same time Ms. McCormick received her pay increase for her increased responsibilities and outstanding performance.

39.     By this scheme, Mr. Capizzi received the equivalent of a 22.08% pay increase and Mr. Doherty received the equivalent of a 29.12% increase, despite the fact that their titles, responsibilities, and workloads remained unchanged.

40.     Mr. Doherty continued to receive additional pay increases each year thereafter to ensure that his compensation always exceeded that of Ms. McCormick.

41.     Mr. Capizzi repeated the practice of securing raises for himself and Mr. Doherty to ensure that Ms. McCormick was never paid as much as male attorneys through the date of her illegal termination.

42.     Through the remainder of her tenure, Mr. Capizzi berated and belittled Ms. McCormick. He enjoyed demeaning her by asserting that her salary was too high and that she did not need to be an attorney to do her job. He seemed to relish bullying and belittling her both in private meetings and in front of her colleagues - so much so that her colleagues expressed shock at Mr. Capizzi's mistreatment of her.

43.     Mr. Capizzi had a habit of belittling and degrading women.

44.     For example, Mr. Capizzi made sexist comments to Ms. McCormick about his new Paralegal, Sheryl Pelletier, gloating that "she was not hired for her brains; she was hired because she is 'eye candy' for the office."

45.     Mr. Capizzi even disparaged his own wife, telling staff that his wife could not hold down a job and was uneducated.

46.     During the spring of 2021, Ms. McCormick confronted Mr. Capizzi about his discriminatory treatment of her.

47.     Ms. McCormick explicitly discussed the way in which she, the only bilingual female attorney employed by the City, was treated as compared to the way Mr. Doherty was treated, citing Mr. Capizzi's practice of allowing himself and Mr. Doherty – but not her – to come and go as they pleased, only rarely accounting for using sick, personal, or vacation time.

48.     Mr. Capizzi seethed at Ms. McCormick's objection to his blatant discrimination.

**Paul Capizzi Retaliates for Ms. McCormick's Report of Discrimination**

49.     Ms. McCormick's 2021 confrontation with Mr. Capizzi led to Mr. Capizzi escalating his discriminatory conduct toward Ms. McCormick.

50.     He inappropriately – and unprofessionally – told Mr. Doherty that Ms. McCormick complained about discrimination, including that favorable payroll practices were enjoyed only by the male attorneys in the Solicitor's Office, with the result that Mr. Doherty, and other male colleagues ceased speaking to Ms. McCormick.

51.     On June 1, 2022, Mayor Arrigo asked Ms. McCormick to meet with him regarding the upcoming budget. When Ms. McCormick arrived at the meeting, Mr. Capizzi and Chief of Staff Kim Hanton were also in attendance.

52.     Mayor Arrigo immediately left the room and Mr. Capizzi informed Ms. McCormick that her position was reclassified under the Solicitor's Office, and that her new title was Assistant City Solicitor.

53.     All management powers were stripped from Ms. McCormick. She was no longer allowed to implement the budget that she created or attend budget meetings, sign purchase orders, or approve payroll.

54.     When Ms. McCormick's position was reclassified as an "Assistant City Solicitor," Mr. Capizzi promoted Mr. Doherty to the previously non-existent role of "First Assistant City Solicitor" because Mr. Capizzi could not tolerate Ms. McCormick and Mr. Doherty having equal titles.

55.     Mr. Capizzi asked a stunned Ms. McCormick to draft a job description of her position, despite the fact that only Mr. Capizzi, as the City Solicitor, knew what duties he would delegate to her, and despite the fact that Mr. Doherty had occupied the Assistant City Solicitor position for sixteen years.

56.     Her physical office remained on the DMI premises, but she would now be under the thumb of Mr. Capizzi.

57.     Mr. Capizzi began to strip the duties from her position, giving them instead to outside counsel, all of whom were male – despite the City's past emphasis on avoiding the use of outside counsel to save the City money.

58.     The duties he stripped included those relating to a major fire at 370 Ocean Avenue that took place on June 22, 2022. Mr. Capizzi hired outside counsel, Attorney Gerry D'Ambrosio to lead and handle the code enforcement matter arising from the fire, knowing that Ms. McCormick ran the program that handled these types of properties.

59.     Not only did he hire outside counsel, but also excluded Ms. McCormick from attending the initial inspection with her team and refused to allow Ms. McCormick to provide input on how the City should handle code enforcement against the property.

9

60.     On July 25, 2022, Mr. Capizzi stripped Ms. McCormick of her public records requests responsibilities for the DMI. He reassigned her duties, Michael Wells, ("Mr. Wells") a former restaurant inspector who now held the role of Director of Municipal Inspections.

61.     Mr. Wells was unqualified for this new role.

62.     On August 30, 2022, Mr. Capizzi demoted Ms. McCormick to the position of Assistant City Solicitor for Municipal Inspections.

63.     Tellingly, he delegated to her the secretarial (and accordingly perceived as feminine) duty of creating new business cards and stationery for herself and changing the City's website to reflect her new title.

64.     In addition, Ms. McCormick became the only employee in the Solicitor's Office who was required to meet with Mr. Capizzi on a weekly or bi-weekly basis.

65.     These meetings were conducted in the shared office space where Mr. Capizzi's and Mr. Doherty's workspaces are only separated by a partial divider.

66.     These meetings were often marked by Mr. Capizzi berating, insulting, and yelling at Ms. McCormick, on many occasions in the presence of Mr. Doherty, sitting behind the divider and well within earshot.

67.     By email on August 30, 2022, Mr. Capizzi changed the policy that Ms. McCormick and other City employees had enjoyed whereby their extra hours were "comped" to them and banked to be used at another time, often to excuse leaving the office early for an appointment and other flexible scheduling needs. Mr. Capizzi stripped those compensatory time rights from Ms. McCormick, claiming comp time was not available "with higher-paid positions such as ours."

68.    Despite this claim, Ms. McCormick's colleagues and many male department heads who earned at least as much as if not significantly higher pay than Ms. McCormick, including but not limited to Mr. Capizzi, Mr. Doherty, Mr. Wells, Director of Municipal Inspections, Mr. Viscay, Chief Financial Officer, Zachary Babo, Director of Parking, and Louis Cavagnaro, Building Commissioner, continued to earn paid comp time for putting in extra work hours, a practice that continued through Ms. McCormick's termination date.

69.    Moreover, none of these men are required to track working time closely and, as result, rarely needed to use sick or vacation time for missed hours during the workday.

70.    Ms. McCormick, in contrast, was required to account for every hour she used, whether vacation time, personal time, or sick time. The time she was out of the office was deducted from her pay, and she was not allowed to make up the time she was out of the office with extra hours or comp time.

71.    Again, this disparate enforcement of the comp time policy was a practice that continued through Ms. McCormick's termination date.

72.    Mr. Capizzi, through Ms. McCormick's termination date, continued his pattern of giving Ms. McCormick's work to male outside counsel, engaging in verbal abuse, hypercriticism of Ms. McCormick's work product, and sexist devaluation of her concerns regarding ethics and other issues Ms. McCormick raised to him on several occasions.

73.    Ms. McCormick brought to Mr. Capizzi's attention several potential ethical and legal violations she witnessed at the building department. Every time Ms. McCormick was told by Mr. Capizzi "mind her own business and stay out of it."  He would also verbally reprimand Ms. McCormick and express outrage, especially when she put her concerns in writing. Encouraged by Mr. Capizzi, and noticing the lack of repercussion, other City officials joined in.

11

**Ms. McCormick Reports Potential Violations of Ethics Rules and General Laws**

74.     On September 22, 2022, Ms. McCormick sent Mr. Capizzi a confidential email, with supporting documents, detailing a potential conflict of interest from D'Ambrosio LLP, the outside law firm to whom the City was outsourcing its legal needs.

75.     She raised a concern that D'Ambrosio LLP was working on several of the City's Safe Housing Task Force matters with Ms. McCormick, while providing representation to and accepting cases from property owners.

76.     Mr. Capizzi instructed Ms. McCormick to call the State Ethics Commission and get a legal opinion, so that he would have accurate information from the State Ethics Board when he called Gerry D'Ambrosio.

77.     Per Mr. Capizzi's instructions, Ms. McCormick called the State Ethics Commission and, shortly thereafter, called Mr. Capizzi to discuss her conclusions. Unexpectedly, Mr. Capizzi became irate at Ms. McCormick, and reported to Gerry D'Ambrosio that Ms. McCormick had called the State Ethics Commission on him.

78.     Ms. McCormick had a long-standing professional relationship with Mr. D'Ambrosio and, in order to dispel Mr. Capizzi's subterfuge, she engaged in a private meeting with Mr. D'Ambrosio.

79.     During the meeting, Mr. D'Ambrosio informed Ms. McCormick that Mr. Capizzi allowed him to read the initial confidential email Ms. McCormick sent in confidence to Mr. Capizzi, in which she first raised a potential conflict.

80.     On September 26, 2022, Mr. Capizzi requested a brief description of exactly what Ms. McCormick had told the State Ethics Board. Ms. McCormick explained clearly that she did

not accuse Mr. D'Ambrosio of any wrongdoing and merely requested a legal opinion on the matter, as Mr. Capizzi had instructed her to do.

81.     In the presence of Mr. Doherty, Mr. Capizzi became irate, yelled at Ms. McCormick, drilled her with questions, and purporting to take notes. When Mr. Capizzi re-read his notes aloud, it was clear that he had purposely misstated what Ms. McCormick had actually said, in an attempt to manipulate the situation against her.

### Paul Capizzi Retaliates for Ms. McCormick's Report of Ethics And Legal Issues

82.     The situation significantly worsened on September 28, 2022. At a meeting between Mr. Capizzi and Ms. McCormick, he berated her for a typo in a motion pleading that was submitted to the Court. He screamed at her and accused her of submitting the wrong version of the motion to the Court, since the typo had been corrected in the version of the motion Ms. McCormick provided to Mr. Capizzi. She attempted to explain the issues she had experienced with version control due to switching between versions of Microsoft Word. Mr. Capizzi was not moved, and continued his tirade.

83.     Mr. Capizzi's tirade continued for an hour and included insulting the quality of Ms. McCormick's work and declaring that she had no right to challenge him on the disparity of the comp time policy. Mr. Capizzi questioned Ms. McCormick's work and qualifications, demanding, "What lawyer work do you actually do?" Mr. Capizzi dismissed each example of the legal duties Ms. McCormick described, claiming for each, "You do not need to be a lawyer to do that."

84.     After an hour of berating her (driving her to tears), Mr. Capizzi insisted that they meet weekly to discuss her work after that point.

85. Later that day, a Clerk Magistrate of the Court to which Ms. McCormick had submitted the motion called her to let her know that Mr. Capizzi had called the Court to verify whether the motion that was filed contained the typo. Mr. Capizzi had asked the Clerk Magistrate to read the paragraph aloud to see if the typo was in fact the document Ms. McCormick sent to the Court. The Clerk Magistrate commented that he found that behavior to be odd when explaining the reason for calling her.

86. Ms. McCormick was so distressed by the meeting with Mr. Capizzi on September 28, 2022 that she called in sick for the following two days: September 29 and 30, 2022.

87. Mr. Capizzi met with Ms. McCormick thereafter on a bi-monthly basis on the pretense of supervising her work and learning about the 40U program she was overseeing. The meetings were lengthy, unproductive, and generally used by Mr. Capizzi to intimidate, harass, criticize, and insult Ms. McCormick.

88. Throughout October and November, Ms. McCormick was assigned additional tasks outside of her job description to be completed in addition to her regular duties. Ms. McCormick reported to Mr. Capizzi that she was drowning in work and was having trouble keeping up, and requested to decrease the bi-monthly meetings to monthly meetings. Mr. Capizzi denied her request and continued assigning her additional tasks.

89. For example, on November 17, 2022, when Mr. Capizzi knew Ms. McCormick was short-staffed and overwhelmed and in the height of certifying thousands of tickets to be applied to the City's tax bill, he emailed Ms. McCormick, instructing her to attend to a City litigation matter and draft a responsive pleading—a task that would ordinarily have been assigned to Mr. Doherty, the Assistant City Solicitor.

**Michael Wells, Director of Municipal Inspections, Forges Ms. McCormick's Signature**

90.     On December 7, 2022, Ms. McCormick learned that Michael Wells, the City's Director of Municipal Inspections had clandestinely obtained her electronic signature from Colleen Argenzio, the City's Assistant to the Director of Municipal Inspections, and forged it on the 40U Certification to Fiscal Year 2023 Tax Bill on which Ms. McCormick had been working.

91.     Mr. Wells knew that Ms. McCormick refused to sign the certification because it included unreasonable and unethical fines that were assessed against 370 Ocean Avenue by outside counsel and Mr. Capizzi. Against the recommendation of Ms. McCormick, the property had been improperly assessed a total of $205,000.00 in fines at a rate of $30,000 per day.

92.     Ms. McCormick previously express her concern to Mr. Capizzi—on many occasions—that the fines were excessive and punitive, and that the City had never before assessed fines against any other property in the City at $30,000.00 per day as Mr. Capizzi authorized against 370 Ocean Ave. Ms. McCormick continued to express her concern to Mr. Capizzi and Mr. Wells regarding the issuance of the excessive fines.

93.     Ms. McCormick informed Michael Wells that she would not sign her name to the tax bill if it included 370 Ocean Ave., yet Mr. Wells intentionally obtained her electronic signature from his assistant, Colleen Argenzio, without Ms. McCormick's permission.

94.     Mr. Wells intentionally affixed Ms. McCormick's electronic signature to the tax bill and submitted the tax certification to Dana Brangiforte, City Assessor, Mr. Viscay, Mr. Capizzi, and others.

95.     When Ms. McCormick became aware of the forgery, she immediately instructed Mr. Wells to withdraw the fraudulent FY23 original certification dated December 8, 2022.

96.     On December 10, 2022, Ms. McCormick wrote to Mayor Arrigo and Linda DeMaio, the Mayor's Executive Assistant, and to request a confidential meeting to discuss both the procedural issue relevant to the Certification and Michael Wells' act of forging her signature.

97.     Instead of holding a confidential meeting between them, Michael Wells, the Director of Municipal Inspections Paul Cheever, the Fire Lieutenant, Paul Capizzi, Mayor Arrigo, Rich Viscay, CFO, Attorney Brunco, Attorney D'Ambrosio, and Louis Cavaganro, the City's Building Commissioner, were in attendance. Mr. Capizzi and Mr. Viscay attempted to pressure Ms. McCormick to certify the Tax Bill as-is, despite the outstanding procedural and ethical violations that needed to be addressed. Mr. Viscay raised his voice out of frustration when Ms. McCormick refused to sign her name to the Certification, shouting that it was her job to do so as the attorney for the department, and that's why she was being paid "six figures."

98.     Despite facing this pressure, Ms. McCormick stood her ground and insisted that the Certification was unethical and inaccurate and had to be amended by removing the fines for 370 Ocean Ave., totaling $205,000, before she would sign it.

99.     At the end of the meeting, and in front of colleagues, Mr. Capizzi shouted, "With your salary, we should not be paying you to certify tickets," and stormed out of the office.

100.    Paul Cheever and Louis Cavagnaro immediately approached Ms. McCormick after the meeting to offer support, stating that Mr. Viscay and Mr. Capizzi were out of line for speaking so terribly to her in front of everyone. They both mentioned to her that it was not the first time they had witnessed the concerning, inappropriate behavior directed at her by Mr. Capizzi and Mr. Viscay.

101.    On December 14, 2022, Ms. McCormick drafted an amended FY23 tax certification, specifically excluding the fines that were egregiously assessed against 370 Ocean Avenue totaling $205,000.00.

102.    Throughout the months of March and April 2023, Ms. McCormick continually reported at bi-weekly meetings with Mr. Capizzi, as well as HR that Mr. Wells had forged her signature. Nothing was done about it.

103.    On November 20, 2023, Ms. McCormick again provided hard copies of the forged FY23 tax certification to Lina Trimelli, Human Resources Director.

### Mr. Capizzi's Gender Discrimination, Harassment, and Retaliation Against Ms. McCormick Continues

104.    In April 2023, Ms. McCormick took and passed the Construction Supervisor Licensing test. Claudia Correa, the Director of Human Resources learned that Ms. McCormick had passed the test and asked Ms. McCormick to submit a request for a reimbursement for the cost of the test—a total of $276.75.

105.    Mr. Capizzi refused to process Ms. McCormick's reimbursement request.

106.    Attorney Doherty routinely takes continuing legal education courses, sometimes even from outside the practice area and skill set required for his position with the City. Upon information and belief, Mr. Capizzi processed and approved every one of Attorney Doherty's reimbursement requests for CLE expenses during Ms. McCormick's employment.

107.    When Ms. Correa learned that Mr. Capizzi had denied Ms. McCormick's reimbursement request, she told Ms. McCormick to submit the request directly to HR. The HR department approved the request and paid the invoice.

108.    On May 24, 2023, after a meeting in which Mr. Viscay, following Mr. Capizzi's lead, was rude and abrasive to Ms. McCormick, she asked Mr. Capizzi if Mr. Viscay would ever

speak to Mr. Capizzi or Mr. Doherty in that fashion. He replied: "Absolutely Not." When Ms.
McCormick responded: "Well, maybe it's because I have boobs," Mr. Capizzi replied: "Yes,
you're probably right" and laughed at her. She asked Mr. Capizzi to report Mr. Viscay's behavior
to Human Resources, but he refused.

109.    After Ms. McCormick learned that Mr. Capizzi refused to report Mr. Viscay's
behavior to HR, Ms. McCormick reported the incident to Ms. Correa. Mr. Capizzi became
incensed at Ms. McCormick's report of this inappropriate behavior and Mr. Capizzi's refusal to
address the same.

110.    In June 2023, the City instituted a pilot program whereby City Hall would close
on Fridays and would have hours from 8:00 a.m. to 5:00 p.m. on Mondays through Thursdays.
Each department head was given the authority to accommodate any problems the new schedule
might pose for staff.

111.    After the schedule change, it usually took Ms. McCormick one hour of travel time
to commute to work, a dramatic increase.

112.    While working in the DMI, Ms. McCormick had been allowed the flexibility to
work from 7:00 a.m. to 4:00 p.m.

113.    Ms. McCormick asked Mr. Capizzi if he would accommodate her commuting
difficulties and allow her to shift her hours to 7:00 a.m. to 4:00 p.m. as she had with the DMI.

114.    Mr. Capizzi refused, duplicitously saying he didn't want to set the stage for the
rest of the office, even though Ms. McCormick's office was still in the DMI building.

115.    This reason was also laughable because, despite the 8:00 a.m. to 5:00 p.m.
schedule set by the City, Mr. Capizzi routinely arrived at the office after 9:00 a.m., and Attorney
Doherty often arrived at the office after 10:00 a.m., without consequence.

18

116.    Mr. Capizzi, during 2023, continued to deny comp time for Ms. McCormick, purportedly due to her high salary. Mr. Capizzi and Mr. Doherty, however, who were both paid a higher salary than her, continued banking and using comp time for the hours they worked in excess of the usual 39-hour work week throughout 2023.

117.    In contrast, Ms. McCormick was still required to work 45-48 hours every other week without earning overtime or comp time and was not afforded the same flexibility in her schedule as her male colleagues enjoyed.

118.    Further, Ms. McCormick was still the only employee required to have bi-monthly one on one meetings with Mr. Capizzi, which continued through August 2023.

### Ms. McCormick Requests Accommodations and FMLA Leave to Care for Her Mother, and Mr. Capizzi's Discrimination and Retaliation Continues

119.    On Sunday, August 19, 2023, Ms. McCormick's 81-year-old mother had a traumatic fall, shattering her T12 vertebrae.

120.    On August 22, 2023, Ms. McCormick went to see Mr. Capizzi in the Solicitor's Office to discuss her need for accommodation to help care for her injured mother.

121.    She arrived at the Solicitor's office at approximately 8:00 a.m. - the start of the City's scheduled workday - expecting Mr. Capizzi to be in the office when the office opened. She waited an hour and twenty minutes for him to arrive. Mr. Capizzi finally arrived (with his dog) at 9:20 a.m. and was too busy to meet with Ms. McCormick, even though she expressed urgency.

122.    Since Mr. Capizzi would not meet with Ms. McCormick she reached out to the Mayor's office for approval of her accommodation.

123.    On August 23, 2023. The Mayor's Office approved a shift in working hours for Ms. McCormick to 7:00 a.m. to 4:00 p.m. for thirty days to care for her mother and meet with the medical team at Lahey Hospital and Medical Center in Burlington.

19

124.    On August 24, 2023, she told Mr. Capizzi of the approval by the Mayor's office, and he became irate. He questioned the legitimacy of Ms. McCormick's need and the veracity of her request, and by email, attempted to countermand the Mayor by denying her request.

125.    Ms. McCormick, of course, was very upset and went to the Mayor's office to discuss Mr. Capizzi's countermand. There, she met with Claudia Correa, the HR Director, and Chief of Staff Robert Marra, Esq.

126.    Mr. Capizzi, although uninvited, abruptly walked into the room, again with his dog, and insulted and berated Ms. McCormick in front of the other meeting attendees.

127.    Mr. Capizzi's tantrum only stopped when Mr. Marra intervened and told Mr. Capizzi to "shut up". Mr. Capizzi nonetheless continued to say her request was denied, despite his acknowledgement that Ms. McCormick's work would not be negatively impacted by the accommodation.

128.    Mr. Capizzi shockingly accused Ms. McCormick of using her mother's injury as a scam. Like Ms. McCormick, Mr. Marra found Mr. Capizzi's behavior appallingly callous. He overruled Mr. Capizzi and allowed Ms. McCormick a temporary change in hours, which immeasurably helped Ms. McCormick care for her mother without requiring her to take time off.

129.    Ms. McCormick, during the late summer of 2023, discussed the ongoing gender-based harassment and discrimination by Mr. Capizzi with then-Acting Mayor Patrick M. Keefe, Jr. and Chief of Staff, Mr. Marra. She informed them of his harassment and discrimination on several occasions, including in-person meetings on August 30, 2023, and September 5, 2023.

130.    Acting Mayor Keefe indicated that, if he were elected, he would have no problem if Ms. McCormick reported to him directly – a representation he later retracted.

131.    Over the course of September, the condition of Ms. McCormick's mother vacillated, requiring her to ask for intermittent leave pursuant to the FMLA, since comp time was still not available to her—and only her.

132.    As she pointed out to Acting Mayor Keefe and various others, Mr. Capizzi and Mr. Doherty were allowed to take time off as needed without resort to completing paperwork or otherwise accounting for time off.

133.    Ms. McCormick, by contrast, was required to complete FMLA paperwork, including additional paperwork for any change in leave requirements, and was required by Mr. Capizzi to log all hours worked each week, as well as all hours taken as FMLA leave (which would be paid through her sick leave bank).

### Ms. McCormick's Unlawful, Retaliatory Termination

134.    On the evening of November 15, 2023, during a tense 40U hearing, a startling incident unfolded when Zach Boba, the Parking Director, erroneously accused Ms. McCormick of relocating the 40U hearing to a conference room, which Mr. Boba had apparently already booked for another event. The accusation was later proved to be wrong.

135.    Believing Ms. McCormick had double-booked the conference room, Mr. Babo berated Ms. McCormick in a highly unprofessional display in front of hearing members and witnesses, including Paralegal Sheryl Pelletier and Municipal Hearings Officer, Attorney Christopher.

136.    Ms. McCormick, rightfully offended by the accusation and disrespectful behavior, promptly addressed the issue by sending an email to Mr. Boba, highlighting the Parking Director's inappropriate conduct. Seeking resolution, she took the initiative to provide Mr.

Capizzi and HR with Attorney Christopher's cell phone numbers as witnesses to Mr. Boba's unprofessional and aggressive behavior.

137.    The City refused to follow up or contact Attorney Christopher. In fact, as of January 12, 2024, two and a half months after Ms. McCormick's illegal termination, not a single person from the City contacted Attorney Christopher who would have substantiated Ms. McCormick's account.

138.    On November 20, 2023, Ms. McCormick went in person to Human Resources to discuss the Babo incident and provided copies of emails related to the incident to Lina Tramelli, the Director of Human Resources.

139.    Ms. McCormick reminded Ms. Tramelli that she had not heard a response from either Human Resources or Paul Capizzi to her multiple complaints of discrimination or her report to both Mr. Capizzi and Human Resources about Michael Wells's act of forging her signature on the tax certification. Ms. McCormick emailed supporting documents to Ms. Tramelli later that day.

140.    Later that same day, after visiting Human Resources to report the latest ongoing discrimination and harassment she had experienced and to personally follow up on her multiple complaints, Ms. McCormick was informed that Mr. Capizzi was moving her from the office she had built on her own time, partly with her own funds and had occupied for years, into a tiny office – dubbed the "broom closet" – in the Solicitor's Office.

141.    Ms. McCormick was shocked at the thought of moving into a tiny office next to the man who had tormented her for years. Later that afternoon, she approached now-Mayor Elect Keefe who confirmed the move into the "broom closet."

142.    Ms. McCormick became physically ill and left work due to anxiety-related medical conditions. She made an appointment with her medical provider who issued a letter recommending that Ms. McCormick take a two-week medical leave of absence from work to seek treatment for her serious medical condition.

143.    Ms. McCormick, accordingly, filed for leave under the FMLA.

144.    That very same day – November 20, 2023 – Ms. McCormick, through counsel, issued a correspondence to the City, copying Mr. Capizzi, requesting a copy of her personnel records, pursuant to M.G.L. c. 149, § 52C, and putting the City on notice of Ms. McCormick's gender-based discrimination and harassment claims, although both the Mayor-Elect, Human Resources and other City officials were already well aware of her complaints.

145.    In what can only be described as a blind rage, Mr. Capizzi – who was not even in the office due to scheduled time off – issued a sloppy, misguided "notice of termination" to Ms. McCormick on the evening of November 21, 2023, in retaliation for Ms. McCormick apprising the City of her gender discrimination and harassment claims, complaining about unlawful conduct by Mr. Wells, communicating with Human Resources about the same, and applying for FMLA leave.

146.    Mr. Capizzi diverted a Revere Police Officer from his duties protecting the residents of the City to deliver the notice to Ms. McCormick in Middleton, over fifteen miles away, during evening rush hour. Mr. Capizzi sent the uniformed police officer to Ms. McCormick's home on the night of November 21, 2023, in a final act of harassment and intimidation.

147.    As if unlawfully terminating Ms. McCormick's employment were not enough, an unknown Revere agent entered Ms. McCormick's office, accessed her computer, and brazenly

23

hacked into her personal e-mail account at 9:45 p.m. on November 21 and 8:08 p.m. on November 23 (Thanksgiving night). This was a clear violation of Ms. McCormick's privacy rights.

148.    On November 22, 2023, and various times thereafter, Ms. McCormick, through counsel, instructed the City to preserve and leave undisturbed Ms. McCormick's personal belongings. However, after Ms. McCormick's termination, she was denied access to the Solicitor's Office to collect her personal property. Rather, some – but not all – of her property was mishandled and haphazardly thrown in a trash bag and left with Human Resources. Many of the returned items were damaged and other items were ransacked. Without being allowed to do a walk-through, Ms. McCormick is uncertain if other property was not returned.

149.    At a minimum, the City has converted and refused to return certain known items of property belonging to Ms. McCormick after her termination:

> 1 IPAD Mini;
> 1 Piece of Wall Art from the Solicitor's Office
> 1 Small plant stand from Solicitor's Office
> 2 large accordion Monthly Redwell Folders with pockets
> 1 Emer coffee cup (Ms. McCormick was given the box, but the box was empty)
> 1 Heavy Duty Multi Extension Cord
> 1 Keurig Coffee Maker

150.    On December 10, 2023, Ms. McCormick, through counsel, wrote to the City's counsel with the above list of property that was not among her returned or collected items and demanded their return. The City continued to deny Ms. McCormick the right to collect the property remaining in the City's offices and refused to return any of the property so listed. None of the aforementioned property has been returned to this day.

### **Defendants Fail to Pay All Wages Due and Owing on the Date of Ms. McCormick's Discharge.**

151.    The City, through its agent, Mr. Capizzi, terminated Ms. McCormick's employment on November 21, 2023.

152.    On the day of discharge, Ms. McCormick was entitled to her full wages then due and owing, including compensation for her time worked to date, holiday pay, and vacation time.

153.    As of November 21, 2023, Ms. McCormick was owed a total of $10,043.90, broken down as follows:

    a.  $590.85 – 9 hours holiday pay for Veteran's Day;

    b.  $2,560.21 for the week ending 11/15/23;

    c.  $1,969.38 for time worked and sick days 11/16/23 to 11/21/23; and,

    d.  $4,923.46 for 75 hours of accrued paid vacation time.

154.    On November 21, the Defendants issued two checks to Ms. McCormick. One check for $4,924.46 gross pay purporting to compensate Ms. McCormick for 75 hours of accrued paid vacation time, though the City wrongfully deducted $530.04 from the gross pay amount as retirement deductions.

155.    The second check in the amount of $1,969.38, also dated November 21, 2023, purported to compensate Ms. McCormick for time worked and sick days taken for the payroll period beginning 11/16/23 up to the date of her termination.

156.    On November 22, 2023, the day *after* her discharge, the Defendants issued Ms. McCormick a check for the payroll period of 11/9/23 to 11/15/23. In addition to being untimely, this check also wrongfully excluded 9 hours of holiday wages Ms. McCormick was owed for Veteran's Day, amounting to $590.85 gross pay.

157.    Ms. McCormick did not immediately receive the pay stub for the November 22, 2023 check for the payroll period of 11/9/23 to 11/15/23. She was first aware of the late payment

of wages when she noticed the post-termination deposit from the Defendants in her bank account and called the City's Treasury Department to ask what the deposit was for.

158.    When Ms. McCormick called the Treasury Department about the strange, post-termination deposit, she also became aware that $530.04 of retirement deductions had been wrongfully withheld from the check for her accrued vacation time issued on November 21, 2023.

159.    The City thereafter issued a check for the $530.04 wrongly deducted from her vacation pay on December 13, 2023.

160.    Of the $10,043.90 of wages due and owing to Ms. McCormick on the date of her discharge, the City only paid her $6,362.80 that day, leaving an unpaid balance of $3,681.10 as of the date of discharge.

161.    Of that $3,681.10 owed and unpaid on the date of her termination, Ms. McCormick was later paid $2,560.21 on November 22, 2023, and $530.04 on December 13, 2023.

162.    As of filing this Complaint, $590.85 remains due and owing but unpaid to Ms. McCormick for 9 hours of vacation pay on Veteran's Day.

163.    By wrongfully deducting and not paying to Ms. McCormick all of the wages she was due and owing upon her termination on November 21, 2023, the City violated the Wage Act.

### The Revere City Council Calls on Mayor Elect to Investigate Gender Discrimination and he Illegal Termination of Ms. McCormick

164.    Anthony Cogliandro, Revere City Council President, called on the Mayor Elect to engage a disinterested third-party to investigate Mr. Capizzi's management of the City Solicitor's Office and his maltreatment of female employees in the aftermath of Ms. McCormick's illegal termination.

165.     Two high-ranking female police captains had also filed complaints at Suffolk Superior Court against Mr. Capizzi and the City.

166.     In retaliation for Mr. Cogliandro's request for a neutral investigation, Revere City Hall executed a campaign of threats, intimidation, and coercion against the members of the Revere City Council.

167.     Shockingly, but not surprisingly, a newly hired employee of the Solicitor's office, Claire Inzerillo, threatened to investigate City Council members' criminal backgrounds to intimidate City Councilors in retribution for requesting a third-party investigation into Mr. Capizzi's discrimination, harassment and retaliation.

168.     The City's behavior in response to the City Council's request for an independent investigation of Mr. Capizzi is consistent with Ms. McCormick's experience of gender-based discrimination that is rampant in the Solicitor's Office and allowed and ignored by the City.

## COUNT I – GENDER DISCRIMINATION
### M.G.L. c. 151B

169.     The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 168 of the Complaint.

170.     Ms. McCormick was a female employee of the Defendants. She was the first and only bilingual female attorney employed by the City.

171.     Ms. McCormick's supervisor, Mr. Capizzi, actively discriminated against Ms. McCormick because of her gender and his anti-female animus.

172.     At all relevant times and specifically at the time of Ms. McCormick's termination, she was performing the essential functions and duties of her position at or above acceptable levels.

173.     Defendants unlawfully terminated Ms. McCormick without cause, due to her gender, and in retaliation for her complaint of gender-based discrimination and harassment to her employer.

174.     Therefore, Ms. McCormick alleges that the Defendants have discriminated against her, because of her gender, in violation of M.G.L. c. 151B.

175.     Ms. McCormick has suffered substantial damages as a result of the Defendants' illegal actions, including lost pay and benefits, severe emotional distress, and harm to her reputation as an attorney.

## COUNT II – RETALIATION
### M.G.L. c. 151B

176.     The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 175 of the Complaint.

177.     Defendants were on notice of Ms. McCormick's supervisor's gender bias and discriminatory acts since approximately Summer 2022, when Ms. McCormick began to report the mistreatment she was suffering to HR, Chief of Staff Robert Marra, Esq., and many other colleagues. The City did nothing to remediate the situation.

178.     From 2021 through 2023, Ms. McCormick was demoted several times, had her job responsibilities stripped from her and given to unqualified male employees or male outside counsel, despite the substantial additional costs.

179.     She specifically complained of gender-based harassment and discrimination to several City officials, including Mayor Keefe, from April into November 2023.

180.     Defendants failed to investigate any of her allegations and, instead, retaliated against Ms. McCormick, because of her reports of gender-based discrimination, in violation of M.G.L. c. 151B.

181.    Ms. McCormick has suffered substantial damages as a result of the Defendants'
illegal actions, including loss of compensation, emotional distress, and harm to her reputation, as
a well-respected attorney amongst her colleagues.

**COUNT III**
**VIOLATION OF THE EQUAL PAY ACT**
**M.G.L. c. 149 § 105A**

182.    The Plaintiff realleges and incorporates by reference the Introduction and
Paragraphs 1 through 181 of the Complaint.

183.    A component of the gender discrimination the Plaintiff faced was unequal
compensation and benefits with her male counterpart, Mr. Doherty, for performing substantially
equal job duties.

184.    Specifically, the Plaintiff was denied the right and ability to work and be paid for
extra comp time and was forced to use her paid time off accruals and account for every hour she
was out of the office, while male employees could come and go as they pleased without being
required to use their accrued paid sick leave.

185.    When the Plaintiff was promoted mid-year in 2022 and was given a significant
salary raise commensurate with the new position by the Mayor, her income briefly exceeded that
of her male counterpart, Mr. Doherty.

186.    The Defendants immediately thereafter gave significant pay raises of
approximately $25,000 each to Mr. Doherty and Mr. Capizzi, such that their incomes exceeded
the Plaintiff's, despite the fact that neither Mr. Capizzi's nor Mr. Doherty's titles or
responsibilities changed.

187.    Despite performing substantially equal job duties requiring equal if not greater
skill, effort, and responsibilities, the Plaintiff was continually paid substantially less than her

male counterpart, Mr. Doherty, through her termination date and she received less compensatory time and other benefits and less advantageous application of paid time off policies than her male peers.

188.    As a direct and proximate result of the Defendants' unlawful conduct in violation of the Equal Pay Act, the Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

**COUNT IV**
**VIOLATION OF THE FMLA**

189.    The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 188 of the Complaint.

190.    At all times relevant herein, the Plaintiff was an "eligible employee" within the meaning of the Family Medical Leave Act, 29 U.S.C. § 2601 ("FMLA").

191.    At all times relevant herein, the Defendants were "covered employers" within the meaning of the FMLA.

192.    On September 21, 2023, HR approved Ms. McCormick's Intermittent FMLA flex schedule, beginning on September 11, 2023, through November 24, 2023.

193.    On or about November 2, 2023, Ms. McCormick requested an extension of her Intermittent FMLA flex schedule since her mother's back injury was not fully healed. Ms. McCormick's extension was approved until January 31, 2024, by HR shortly thereafter.

194.    On November 20, 2023, due to the on-going maltreatment of Ms. McCormick by Mr. Capizzi, Ms. McCormick's provider instructed her to take a two-week medical leave of absence from November 20, 2023 - December 8, 2023. Accordingly, through counsel, Ms. McCormick initiated her application for leave under the FMLA the same day.

195.     On November 21, 2023, the City, through Mr. Capizzi unlawfully terminated Ms. McCormick without cause and in retaliation for her exercising her FMLA rights.

196.     By the actions described above, among others, the Defendants violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of the Plaintiff's rights by, inter alia, terminating her employment without cause, an action that would clearly deter employees from exercising their rights under the FMLA.

197.     As a direct and proximate result of the Defendants' unlawful conduct in violation of the FMLA, the Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT V
## RETALIATION IN VIOLATION OF THE FMLA

198.     The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 197 of the Complaint.

199.     At all times relevant herein, the Plaintiff was an "eligible employee" within the meaning of the Family Medical Leave Act, 29 U.S.C. § 2601 ("FMLA").

200.     At all times relevant herein, the Defendants were "covered employers" within the meaning of the FMLA.

201.     Plaintiff filed a request for leave under the FMLA on November 20, 2023. The City, through Mr. Capizzi, terminated the Plaintiff's employment without cause the following day, November 21, 2023 in retaliation for her exercising her FMLA rights.

202.     By the actions described above, among others, the Defendants violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of the Plaintiff's rights by,

inter alia, terminating her employment without cause, an action that would clearly deter employees from exercising their rights under the FMLA.

203.    As a direct and proximate result of the Defendants' unlawful conduct in violation of the FMLA, the Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT VI
## WHISTLEBLOWER RETALIATION
## M.G.L. 149 § 185

204.    The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 203 of the Complaint.

205.    Plaintiff disclosed to Mr. Capizzi, her direct supervisor, several acts and practices of the City and its officials which she reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law, including unlawful gender discrimination and harassment against her and a toxic work environment pervaded by the same; unethical conflicts of interest with outside counsel representing the City; the unethical, excessive, and procedurally improper assessment of tickets and fines against a particular property within the City for violating municipal law; and the forgery of her signature on an annual statutory certification for the City's tax bill.

206.    Further, Plaintiff refused to participate in the certification of the tax bill when it improperly reported as liens certain excessive, unethical and procedurally improper fines assessed against a property within the City, despite the Defendants' attempts to intimidate her into doing so and their harassment and retaliation when she would not certify the tax bill until it was properly amended.

207.    Plaintiff also disclosed these acts and practices to the City's Human Resources department and other appropriate City officials.

208.    Consequently, in retaliation for these whistleblowing acts, the Defendants demoted the Plaintiff and/or caused material changes to her job positions and job responsibilities, and ultimately terminated her employment for pretextual reasons.

209.    By the actions described above, among others, the Defendants violated the public employee whistleblowing statute by unlawfully retaliating against the Plaintiff for her disclosure of acts and practices she believed were in violation of a law, rule, or regulation.

210.    By the actions described above, the Defendants also violated the public employee whistleblowing statute by unlawfully retaliating against the Plaintiff for refusing to participate in activity she reasonably believed was in violation of law.

211.    As a direct and proximate result of the Defendants' unlawful conduct in violation of the public employee whistleblower statute, the Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT VII
## VIOLATION OF THE WAGE ACT

212.    The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 211 of the Complaint.

213.    The City, through its agent, Mr. Capizzi, terminated Ms. McCormick's employment on November 21, 2023.

214.    On the day of discharge, Ms. McCormick was entitled to her full wages then due and owing, including compensation for her time worked to date, holiday pay, and vacation time.

215.    Of the $10,043.90 due and owing to Ms. McCormick on the date of her discharge, November 21, 2023, the City only paid her $6,362.80 that day, leaving an unpaid balance of $3,681.10.

216.    By wrongfully deducting and not paying to Ms. McCormick all of the wages she was due and owing upon her termination on November 21, 2023, the City violated the Wage Act.

217.    As a direct and proximate result of the Defendants' unlawful conduct in violation of the Massachusetts Wage Act, the Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of treble damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

### COUNT VIII
### VIOLATION OF THE STATUTORY RIGHT TO PRIVACY
### M.G.L. c. 214 § 1B

218.    The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 217 of the Complaint.

219.    Under M.G.L. c. 214 § 1B, a person shall have a right against unreasonable, substantial, or serious interference with their privacy.

220.    Neither the Defendants, nor their agents, were entitled, permitted, or authorized to access Plaintiff's private, password-protected email account.

221.    The Plaintiff's private email account was password-protected, making it inaccessible to the public.

222.    The Defendants or their agent(s) unlawfully, unreasonably, substantially, and seriously interfered with the Plaintiff's privacy by hacking into her private, password-protected email account and viewing her email correspondence.

223.    As a direct and proximate result of the Defendants' unlawful conduct in violation of the Massachusetts Privacy Act, the Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law.

## COUNT IX
## CONVERSION

224.    The Plaintiff realleges and incorporates by reference the Introduction and Paragraphs 1 through 223 of the Complaint.

225.    By refusing to allow the Plaintiff to collect her personal belongings after the Defendants terminated her employment, and by failing to return all items of her property, even after explicit written demand therefor, the Defendants intentionally and wrongfully exercised acts of ownership, control or dominion over her personal property to which they have no right of possession at any time.

226.    As a direct and proximate result of the Defendants' unlawful conduct in converting and retaining wrongful possession of the Plaintiff's personal property, she has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law.

**WHEREFORE**, the Plaintiff, Cheryl McCormick, prays that this Court enter judgment against the Defendant, the City of Revere, on each and every count and award her monetary damages, trebled, in addition to his reasonable attorneys' fees and costs, pre- and post-judgment interest, and such other, further and different relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE**

Respectfully Submitted,

Cheryl McCormick, Esq.

By her attorneys:

John F. Tocci, Esq., BBO# 562139
Rebecca Royer, Esq., BBO# 692337
Tocci & Lee, LLC
355 Providence Hwy
Westwood, MA 02090
(617) 542-6200
(617) 542-6201 (fax)
jtocci@toccilee.com
rroyer@toccilee.com

Dated: April 30, 2024

36

# **EXHIBIT 1**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

December 21, 2023

John Tocci, Esq.
355 Providence Highway
Westwood, MA 02090

RE:    Cheryl McCormick
        Request for Private Right of Action against City of Revere

Dear Attorney Tocci:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

Massachusetts General Laws Chapter 149, § 150, and Chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.

This letter is to inform you that we are authorizing you to pursue this matter through a private civil lawsuit. If you elect to sue in civil court, you may bring an action on your own or your clients' behalf, and on behalf of other similarly situated workers.

This office will not pursue an investigation or enforcement at this time.

Sincerely,

Fair Labor Division
Office of the Massachusetts Attorney General
(617) 727-3465

# **EXHIBIT 2**

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

## - DISMISSAL -

| To: | Rebecca Royer, Esq.<br>Tocci & Lee, LLC<br>355 Providence Highway<br>Westwood, MA 02090 | Case: Cheryl A. McCormick v. City of Revere, Paul Capizzi<br>**MCAD Docket Number:** 23BEM03628<br>**EEOC/HUD Number:** 16C-2024-00713<br>**Investigator:** Lila Roberts |
|---|---|---|

Your complaint has been dismissed as follows:

[ ]     Pursuant to 804 CMR 1.08(1)(a) (2020), the Commission accords substantial weight to the findings or resolution of the complaint by another forum and has decided to close the investigation accordingly.

[X]     Pursuant to 804 CMR 1.08(1)(b) (2020), the complaint is dismissed after being withdrawn pursuant to 804 CMR 1.04(12) (2020). You are required to file a copy of a complaint filed in court after withdrawal from the Commission with the Commission's Office of the General Counsel pursuant to 804 CMR 1.04(13) (2020).

[ ]     Pursuant to 804 CMR 1.08(1)(d) (2020), the complaint is administratively dismissed due to:

> [ ] bankruptcy of a party
> [ ] death of a party
> [ ] inability to locate a party after providing the party 30 days in which to respond to a notice sent to the party's last known address
> [ ] adjudication by another forum
> [ ] unreasonable refusal by complainant to cooperate with processing the case
> [ ] failure to participate
> [ ] refusal to accept a reasonable settlement offer
> [ ] other:

[ ]     Pursuant to 804 CMR 1.08(1)(e) (2020), the parties have settled the case.

[ ]     Pursuant to 804 CMR 1.08(4)(a)(5) (2020), the Commission has entered an order reversing a probable cause determination.

**Please note that further administrative or judicial review of the dismissal of your complaint is unavailable.**

_Sunila S. G_                                        April 23, 2024
_____                    _____
Sunila Thomas George                               Date
Investigating Commissioner

MCAD Docket Number 23BEM03628, Dismissal without Right to Appeal

**THE COMMONWEALTH OF MASSACHUSETTS**
**COMMISSION AGAINST DISCRIMINATION**
One Ashburton Place, Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

Cc:Cheryl A. McCormick
9 Kassiotis Lane
Middleton, MA 01949

City of Revere
Attn: Human Resources/Legal Department
Revere City Hall
281 Broadway
Revere, MA 02151

Gareth W. Notis, Esquire
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02110-1181

John F. Tocci, Esq.
Tocci & Lee, LLC
355 Providence Highway
Westwood, MA 02090

Paul Capizzi
City of Revere
Attn: Human Resources/Legal Department
Revere City Hall
281 Broadway
Revere, MA 02151

MCAD Docket Number 23BEM03628, Dismissal without Right to Appeal