UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHERYL A. LEON-MCCORMICK, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 1:24-cv-11480-IT |
| | * |
| CITY OF REVERE and PAUL CAPIZZI, in his individual capacity, | * |
| | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

February 12, 2025

TALWANI, D.J.

This is a case alleging unlawful discrimination and retaliation at the Revere City Solicitor's Office over the course of 16 years. On July 1, 2024, Plaintiff Cheryl Leon-McCormick ("McCormick") filed suit against Defendants City of Revere ("City") and City Solicitor Paul Capizzi. See Notice of Removal at 1 [Doc. No. 1]. Her Amended Complaint [Doc. No. 10] asserts nine causes of action. Seven causes of action are brought against both Defendants: gender discrimination and retaliation under M.G.L. c. 151B (Counts I and II); violation of the Massachusetts Equal Pay Act, M.G.L. c. 149, § 105A (Count III); violation of and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 (Counts IV and V); violation of the Massachusetts Wage Act (Count VII); and violation of the statutory right to privacy under M.G.L. c. 214, § 1B (Count VIII). One cause of action is brought solely against the City, for whistleblower retaliation under the Massachusetts Whistleblower Statute, M.G.L. c. 149, § 185 (Count VI). One cause of action is brought solely against Capizzi, for conversion (Count IX).

Now before the court is Defendants' Motion to Dismiss [Doc. No. 17] seeking dismissal under Fed. R. Civ. P. 41(b) and partial dismissal under Rule 12(b)(6). For the reasons discussed below, the Motion is GRANTED in part as unopposed and is otherwise DENIED.

I.      **Dismissal under Rule 41(b)**

Defendants argue, somewhat perplexingly, that the Amended Complaint should be dismissed under Rule 41(b) for failure to comply with the Federal Rules of Civil Procedure because it "unjustifiably burdens the defendants" by requiring that they answer "highly descriptive factual allegations." Defs.' Mem. ISO Mot. to Dismiss ("Defs.' Mem.") at 4 [Doc. No. 18]. They contend the Amended Complaint "lumps the defendants together—the City and Capizzi—and treats them as one amorphous whole" in violation of Rule 8(a)(2) and does not "appropriately identify against which defendant each Count is asserted" in violation of Rule 10(b). Id. at 4-5.

Rule 8(a)(2) requires only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10(b) requires only that claims be stated in numbered paragraphs, and that, "if doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Fed. R. Civ. P. 10(b).

The Amended Complaint accomplishes both. It begins with a "Factual Background" section that proceeds chronologically in numbered paragraphs with headings summarizing the incidents and episodes alleged, and clearly specifies who allegedly did what. See Am. Compl. ¶¶ 12-204 [Doc. No. 10]. The nine causes of action against Defendants also specify whether each count is brought against only one or both Defendants. See id. ¶¶ 205-263.

Defendants offer no authority for the proposition that the Amended Complaint should be dismissed because it is too detailed. The cases they cite concern pleadings so unclear that

defendants would have to speculate about which claim was brought against whom, alongside failures by a plaintiff to amend a pleading as ordered by the court. See, e.g., Keuhl v. FDIC, 8 F.3d 905, 908 (1st Cir. 1993); Bagheri v. Galligan, 160 Fed. App'x 4, 5 (1st Cir. 2005). None of those concerns are relevant here.

The court finds the Amended Complaint complies with Rules 8(a)(2) and 10(b) and that Defendants have shown no cause for dismissal under Rule 41(b).

## II.     Partial Dismissal under Rule 12(b)(6)

### A.     Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B.     Facts As Alleged in the Amended Complaint

McCormick was employed by the City for 16 years, beginning in 2007 as a paralegal at the Revere City Solicitor's Office. Am. Compl. ¶¶ 19-21 [Doc. No. 10]. In 2013, McCormick was sworn in as a member of the Massachusetts Bar and continued working for the same office as an attorney. Id. ¶¶ 22, 24. At all relevant times, Capizzi was the City Solicitor, a role in which he oversaw all aspects of the City Solicitor's Office and had substantial control over its finances,

in addition to employee discipline and performance assessments. Id. ¶¶ 12-16. Capizzi directed and supervised McCormick during her employment. Id. ¶ 17. McCormick was the only female attorney employed by the City. Id. ¶ 20.[1]

McCormick's allegations of disparate treatment are manifold. The court does not recount them in full but summarizes them by theme below.

### 1. Allegations Regarding Salary

Capizzi imposed a salary ceiling on McCormick to ensure that she never earned as much as her male counterparts. See id. ¶¶ 45, 48-49. For example, for three years after McCormick was admitted to the Bar and had earned the title of Deputy Assistant City Solicitor, Capizzi continued to pay her a paralegal's salary until she filed a grievance and prevailed in arbitration in 2016, leading to "slightly increased" pay. Id. ¶ 23.

In 2020, McCormick received a significant salary increase that would equalize her pay with her male counterpart at the City Solicitor's Office, Assistant City Solicitor Daniel Doherty. Id. ¶ 41. When Capizzi heard about this, he "angrily vowed to Ms. McCormick that she 'will never make more than Dan Doherty.'" Id. ¶ 45. Capizzi then secured a 22 percent raise for himself and a 29 percent raise for Doherty during the 2020 fiscal year, although his and Doherty's titles and workloads did not change. Id. ¶¶ 46-47.

### 2. Allegations Regarding Reclassification

In 2019, City Mayor Brian Arrigo promoted McCormick to the position of General Counsel for the Department for Municipal Inspections ("DMI") and she was relocated to a different office building. Id. ¶¶ 29, 35. There, her responsibilities substantially increased,

---

[1] It is unclear from the Amended Complaint whether Plaintiff claims that this was the situation at the time of her termination in 2023, or throughout the 16 years of her employment.

including designing the budget, directing staff, leading the City's Safe House Task Force, and representing the City at administrative hearings. Id. ¶¶ 38-41. Although not explicitly stated in the Amended Complaint, it appears that Plaintiff is claiming that as General Counsel of DMI, McCormick was no longer under Capizzi's direct supervision and he was "outraged" that McCormick had been appointed to the position by Mayor Arrigo and received a salary increase without input from Capizzi. Id. ¶ 30. However, Capizzi still retained control over her access to the electronic files of the City Solicitor's Office and he cut her access off for months following her promotion to General Counsel even though access was required. Id. ¶¶ 31-32.

In June 2022, Capizzi reclassified McCormick's position to be under the City Solicitor's Office and her title was changed from General Counsel of DMI back to "Assistant City Solicitor." Id. ¶¶ 60-62.[2] At the same time, he promoted Doherty to the "previously non-existent role of 'First Assistant City Solicitor.'" Id. ¶ 62. Capizzi also eliminated McCormick's management duties and public record request responsibilities for DMI. Id. ¶¶ 61, 65-68. Many of her responsibilities were offloaded to male outside counsel by Capizzi. Id. ¶ 65.

In August 2022, Capizzi further demoted McCormick to "Assistant City Solicitor for Municipal Inspections." Id. ¶ 70. Around this time, she also became the only employee in the City Solicitor's Office required to meet weekly or bi-weekly with Capizzi, during which time he would berate and insult her in an open space shared with other employees. Id. ¶¶ 72-74. Although these meetings decreased to monthly or bi-monthly occurrences, McCormick remained the only employee required to have such meetings with Capizzi through August 2023. Id. ¶ 139.

---

[2] City Mayor Arrigo arranged the meeting at which McCormick was informed of the change but immediately left the room when she arrived and Capizzi informed her of the change. See id. ¶¶ 59-60.

5

### 3.   Allegations Regarding Verbal Mistreatment

"Mr. Capizzi had a habit of belittling and degrading women," such as telling McCormick that Capizzi's new paralegal "was not hired for her brains; she was hired because she is 'eye candy' for the office," and that his wife could not hold down a job and was uneducated. Id. ¶¶ 51-53.

He also berated and belittled McCormick. See id. ¶¶ 17, 50, 116. Capizzi continued to refer to her as his "assistant," despite her promotion from paralegal to Deputy Assistant City Solicitor, and gave her menial tasks that were outside the responsibilities of a licensed attorney, such as processing payroll and ordering office supplies. Id. ¶¶ 24, 26, 33. Years after McCormick became an attorney, Capizzi asked her what legal work she "actually do[es]," and told her that her salary was too high and that one did not need to be a lawyer to do her job. Id. ¶ 95. He verbally reprimanded McCormick with an apparent lack of repercussion, which "[e]ncouraged . . . other City officials [to] join[] in." Id. ¶ 83.

### 4.   Allegations Regarding Banked and Compensatory Hours

Capizzi required McCormick to account for every hour she was out of the office while her male counterparts could come and go as they pleased. Id. ¶¶ 27-28. Even after she became an attorney, Capizzi required McCormick to process payroll—as she had done as a paralegal. Id. ¶ 24. For years, Capizzi instructed McCormick to enter Capizzi and Doherty's hours as 39 per week, even when they had in fact worked reduced hours or part-time. Id. ¶¶ 25, 27. In August 2022, Capizzi changed the hours policy for the City Solicitor's Office. Id. ¶ 75. Previously, employees could bank the extra hours they worked, which would be "comped" to them to be used at another time (such as for appointments); the new policy purported to disallow this. Id. In practice, however, the new policy only applied to McCormick, who alone had to account for her

6

hours, had her pay deducted for any time out of the office, and was not allowed to make up that time with banked hours. Id. ¶¶ 76-79. When asked about this change, Capizzi explained to McCormick that her comped time rights had been stripped because of her high salary; this was despite her male colleagues, including Capizzi and Doherty, earning as much as or more than her but routinely using comped time. Id. ¶¶ 75, 77. During 2023, McCormick worked 45-48 hours every other week and Capizzi continuously denied her comped time or overtime pay. Id. ¶ 138.

### 5.  Allegations Regarding Reporting Conflicts of Interest and Other Violations

In early 2021, McCormick discussed with Capizzi the disparate treatment she believed she was facing. Id. ¶ 54. Capizzi told Doherty about this confrontation, which resulted in Doherty and McCormick's "other male colleagues" ceasing communication with her. Id. ¶ 58.

McCormick also brought to Capizzi multiple concerns about "several potential ethical and legal violations she witnessed at the building department," both in writing and in person. Id. ¶¶ 82-83. Capizzi responded with verbal reprimand and outrage, and told her to "mind her own business and stay out of it." Id. ¶ 83. In September 2022, for example, McCormick raised with Capizzi a potential conflict of interest with D'Ambrosio LLP, a firm the City had retained as outside counsel to work on the City's Safe Housing Task Force matters, while D'Ambrosio LLP was also representing property owners. Id. ¶¶ 84-85. Capizzi instructed McCormick to call the State Ethics Commission to receive a legal opinion on the matter. Id. ¶ 86. When she did, Capizzi reported to Gerry D'Ambrosio (presumably of D'Ambrosio LLP) "that Ms. McCormick had called the State Ethics Commission on him" and "allowed him to read the initial confidential email Ms. McCormick sent in confidence to Mr. Capizzi, in which she first raised a potential conflict." Id. ¶¶ 87-89.

7

In December 2022, McCormick learned that the City's Director of Municipal Inspections had "clandestinely obtained her electronic signature . . . and forged it on" a tax bill certification on which she had been working. Id. ¶¶ 104, 108. She had previously refused to sign the certification "because it included unreasonable and unethical fines that were assessed against [a property] by outside counsel and Mr. Capizzi," fines at a rate the City had not previously assessed against any other property. Id. ¶¶ 105-107. When she discovered the forgery, McCormick instructed the City Director of Municipal Inspections to withdraw the fraudulent certification, and McCormick drafted and signed an amended certification excluding the fines she had not approved. Id. ¶¶ 109, 117. However, nothing was done internally about the fact that her signature had been forged, despite McCormick meeting and communicating with Capizzi and the City's Human Resources Department about the forgery through at least November 2023. Id. ¶¶ 118-19.

In 2023, McCormick met several times with then-Acting Mayor Patrick Keefe and his Chief of Staff to discuss the gender-based harassment and discrimination she faced from Capizzi. Id. ¶ 153. Ultimately, nothing was done about this treatment. See id. ¶¶ 154, 213.

Another issue she raised with the Mayor's Office was Capizzi's repeated refusal to meet with her to discuss a temporary change of work hours to support her mother, who had had a traumatic fall that shattered one of her vertebrae. Id. ¶¶ 140-44. The Mayor's Office approved her request, and when McCormick informed Capizzi of this, he "attempted to countermand the Mayor by denying her request." Id. ¶¶ 145-46. In a subsequent meeting at the Mayor's Office to address Capizzi's countermand, Capizzi entered the meeting uninvited, "insulted and berated Ms. McCormick," "accused Ms. McCormick of using her mother's injury as a scam," and insisted on the denial of her request despite acknowledging that her work "would not be negatively impacted

8

by the accommodation." Id. ¶¶ 147-151. The Acting Mayor's Chief of Staff overruled Capizzi's countermand. Id. ¶ 152.

On November 20, 2023, McCormick met with the City's Director of Human Resources about an incident in which another male colleague "berated" McCormick in front of members of the public during an administrative hearing. Id. ¶¶ 158-62. She had previously reported other issues to Human Resources—from her discriminatory treatment to the forgery of her signature—and had still not received a response. Id. ¶ 163.

      **6.**      **Allegations Regarding Her Termination**

On November 20, 2023, the same day as her last visit to Human Resources, McCormick was informed that Capizzi was moving her physical office. Id. ¶ 164. Through her various title changes, she had continued working in an office across the street at DMI, but Capizzi was now moving her back across the street, to a smaller office next to Capizzi's and colloquially known as the "broom closet." Id. After hearing this news, McCormick became "physically ill" and had to leave work due to an "anxiety-related medical condition." Id. ¶ 167. Pursuant to the advice of her medical provider, she filed for two weeks of leave under the Family Medical Leave Act. Id. ¶¶ 167-68. That same day, her attorney sent a letter to the City, copying Capizzi, to put the City on notice of her gender discrimination and harassment claims. Id. ¶ 169.

On the evening of the next day, November 21, 2023, Capizzi issued a notice of McCormick's termination. Id. ¶ 171. Mayor Keefe confirmed on November 27 that McCormick had been terminated with his assent. Id. ¶ 174. On two separate evenings that week, "an unknown Revere agent entered Ms. McCormick's office, accessed her computer, and brazenly hacked into her personal e-mail account." Id. ¶ 172. When she went to collect her belongings after her termination, McCormick was denied access to the City Solicitor's Office. Id. ¶¶ 175-78.

9

After multiple requests from her counsel, some of McCormick's property was gathered for her and left with Human Resources, "clearly mishandled and haphazardly thrown in a trash bag," with many of the items "damaged and other items [] ransacked." Id. ¶ 180.

At the time of McCormick's termination, she was not paid "her full wages then due and owing, including compensation for her time worked to date, holiday pay, and vacation time." Id. ¶¶ 187-88. Although the majority of these wages was ultimately paid, McCormick contends the payments were untimely, and a portion still remains outstanding. Id. ¶¶ 189-97.

### C.    Discussion

Defendants seek partial dismissal under Rule 12(b)(6) for three reasons. First, they argue that because McCormick has brought a retaliation claim under the Massachusetts Whistleblower Statute, all other claims are deemed waived by a provision of that statute. Second, they argue that Capizzi is not subject to individual liability under the Massachusetts Equal Pay Act ("MEPA"). Finally, they argue the City is immune from McCormick's invasion of privacy claim. The court addresses each of these in turn.

#### 1.    Waiver of Retaliation Claims

Count VI is for whistleblower retaliation under the Massachusetts Whistleblower Statute, M.G.L. c. 149, § 185. Am. Compl. ¶¶ 240-47 [Doc. No. 10]. Defendants argue that once Plaintiff chose to pursue this remedy, all of her other claims must be dismissed. Defs.' Mem. at 6 [Doc. No. 18]. The court finds Defendants' argument unpersuasive.

Under the Whistleblower Statute, an employer is prohibited from taking a retaliatory action against an employee because the employee engages in specified whistleblowing activities, including disclosing to a supervisor a "policy or practice . . . that the employee reasonably believes is in violation of a law[.]" M.G.L. c. 149, § 185(b). McCormick alleges that "the City, through its agent Mr. Capizzi," took unlawful actions in retaliation for her whistleblowing to

10

Capizzi, Human Resources, and other City officials about unlawful acts and practices by the City, including: "[1] unlawful gender discrimination and harassment against her and a toxic work environment pervaded by the same; [2] unethical conflicts of interest with outside counsel representing the City; [3] the unethical, excessive, and procedurally improper assessment of tickets and fines against a particular property within the City for violating municipal law;[3] and [4] the forgery of her signature on an annual statutory certification for the City's tax bill." Am. Compl. ¶¶ 241, 243 [Doc. No. 10].

An employee aggrieved by the employer's violation of this statute may initiate a civil action. M.G.L. c. 149, § 185(d). The statute provides, however, that initiating a whistleblower retaliation claim under the Massachusetts Whistleblower Statute "shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer . . . under any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law." Id. § 185(f) (emphasis added). Courts in this district have found the provision to require waiver only of claims for the same retaliatory conduct, not "other claims . . . that are distinct from the claim to recover for the retaliatory action." Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 220 (D. Mass. 2002), aff'd, 362 F.3d 1 (1st Cir. 2004); see also Connolly v. Woburn Pub. Sch., 659 F. Supp. 3d 92, 113-14 (D. Mass. 2023) (same). The waiver only applies to state, not federal, claims. Bolduc v. Town of Webster, 629 F. Supp. 2d 132, 147 n.17 (D. Mass. 2009). And because the statute "permits only an 'employer' to be sued, not individual supervisors," Welch v. Ciampa, 542 F.3d 927, 943 n.7 (1st Cir. 2008) (quoting Bennett, 230 F.

---

[3] She also alleges that Capizzi and other City officials attempted to intimidate her into certifying that fine, which she believed to be "excessive, unethical and procedurally improper." Am. Compl. ¶ 242 [Doc. No. 10].

11

Supp. 2d at 221), individual supervisors may "be named on separate counts that would otherwise be subject to waiver." Bennett, 230 F. Supp. 2d at 221 (citation omitted). In short, the Massachusetts Whistleblower Statute is "obviously designed to broaden protection to vulnerable workers, not to force them to jettison legitimate independent claims as a condition to invoking a statute." Id. at 220-21.

The waiver provision is inapplicable to McCormick's claims for violations of the Family and Medical Leave Act ("FMLA"), because the FMLA is a federal statute. See Bolduc, 629 F. Supp. 2d at 147 n.17. And McCormick's claims against Capizzi are also not barred, as these are not claims against the City. Nor are McCormick's state law claims against the City that are unrelated to any retaliation—namely, violation of the Massachusetts Equal Pay Act, violation of the Massachusetts Wage Act, violation of the statutory right to privacy under M.G.L. c. 214, § 1B, and violation of M.G.L. c. 151B based on gender-based discrimination—barred as these are distinct from the claim to recover for the retaliatory action.

The more difficult question concerns Counts I and II, to the extent that these counts are asserted against the City and allege retaliation under M.G.L. c. 151B. See Am. Compl. ¶ 209 (Count I: City "unlawfully terminated Ms. McCormick . . . in retaliation for her complaint of gender-based discrimination and harassment to her employer") [Doc No. 10]; id. ¶ 216 (Count II: City "retaliated against Ms. McCormick, because of her reports of gender-based discrimination"). These Chapter 151B retaliation claims overlap with one of the four categories of whistleblowing activities listed in McCormick's Chapter 149 whistleblower claim.

However, "if [Chapter] 151B is available, an aggrieved employee may not bring a claim under another statute in the first instance." Thurdin v. SEI Bos., LLC, 452 Mass. 436, 442, 895 N.E.2d 446 (2008) (citing Charland v. Muzi Motors, Inc., 417 Mass. 580, 586, 631 N.E.2d 555

12

(1994)). Chapter 151B "provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." Charland, 417 Mass. at 586; see also Green v. Wyman-Gordon Co., 422 Mass. 551, 555, 664 N.E.2d 808 (1996) ("where c. 151B applies, a person may not evade its procedural requirements by recasting a discrimination claim as a violation of" other statutes). For example, Massachusetts state courts have barred "conventional allegations of retaliation for complaining about discrimination and harassment at work" under the Healthcare Whistleblower Act, M.G.L. c. 149, § 187, when such claims are available under Chapter 151B. Kagacha v. Mass. Dep't of Dev. Servs., 2022 WL 1491180, at *1 (Mass. Super. May 10, 2022) ("Massachusetts law already provides a comprehensive remedial scheme to combat retaliation against those who oppose such workplace misconduct" under M.G.L. c. 151B, §§ 4(4), 4(4A)).

Thus, Chapter 151B is the exclusive remedy for the gender-based retaliation claim raised by McCormick in the Whistleblower Statute Count. See M.G.L. c. 151B, § 4(4) (unlawful for any person or employer to "discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter"); id. § 4(4A) (unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter"). The court therefore disregards Count VI's allegation that McCormick engaged in whistleblowing concerning "unlawful gender discrimination and harassment against her and a toxic work environment pervaded by the same," Am. Compl. ¶ 241 [Doc. No. 10], as these allegations are not actionable under the Whistleblower Statute. And once these allegations are disregarded in the Whistleblower Statute claim, the Whistleblower Statute claim based on her other three categories of whistleblowing activities does not serve to waive the retaliation for raising gender-based claims brought under Counts I and II.

13

Accordingly, none of McCormick's other claims is deemed waived by her bringing Count VI under the Whistleblower Statute.

### 2. Individual Liability Under the Massachusetts Equal Pay Act

Defendants argue that McCormick's MEPA claim should be dismissed against Capizzi because he did not exercise sufficient control or authority to be considered an "employer" under the statute. Defs.' Mem. at 7 [Doc. No. 18]. The court disagrees.

Under MEPA, "[n]o employer shall discriminate in any way on the basis of gender in the payment of wages . . . ." M.G.L. c. 149, § 105A(b). "Employer" is defined by MEPA to "include any person acting in the interest of an employer directly or indirectly." Id. § 1. The First Circuit has not addressed individual liability under MEPA, but has addressed the same issue under the Federal Labor Standards Act ("FLSA"), which has identical language in its definition of employer at 29 U.S.C. § 203(d). See Danio v. Emerson Coll., 963 F. Supp. 61, 63 (D. Mass. 1997) (citing Donovan v. Agnew, 712 F.2d 1509, 1510 (1st Cir. 1983) and construing definition of "employer" in MEPA and FLSA similarly).

Under the FLSA, the First Circuit applies an "economic reality test" in light of Congress's clear refusal "to incorporate the common law parameters of the employer-employee relationship" into its definition of "employer." Donovan, 712 F.2d at 1513. The economic reality test "look[s] to the totality of the individual's level of involvement with the corporation's day-to-day operations, as well as their direct participation in creating or adopting the unlawful pay practices." Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 47 (1st Cir. 2013) (citing Donovan, 712 F.2d at 1513-14). This "analysis focuse[s] on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits." Id. (quoting Baystate Alternative Staffing, Inc. v.

Herman, 163 F.3d 668, 678 (1st Cir. 1998)). Much of the caselaw highlights an individual's ownership interest in and financial control over a corporation, but "[t]his is not to say that the FLSA's definition of employer excludes those without high executive positions or ownership interests, as the economic reality test speaks broadly of individuals who have 'operational control over significant aspects of the business.'" Id. (quoting Baystate, 163 F.3d at 678); cf. Jancey v. Sch. Comm. of Everett, 421 Mass. 482, 500, 658 N.E.2d 162 (1995) (MEPA definition of employer "encompass[es] . . . both the public and private sectors").

McCormick alleges that Capizzi "oversaw all aspects of the City Solicitor's Office and directed its day-to-day operations." Am. Compl. ¶ 12 [Doc No. 10]. He allegedly had the authority to hire and fire employees, and did fire McCormick. Id. ¶¶ 15, 18. He exercised his authority to change her job title, job duties, and workplace location. Id. ¶¶ 24, 60-62, 70-71, 164. He allegedly stripped her job duties by delegating her tasks to outside counsel on behalf of the City, which had consequences for the City's budget. Id. ¶¶ 14, 65-67, 81. He controlled her salary and, in 2016, was compelled to increase her pay only after she prevailed in arbitration. Id. ¶ 23. When McCormick was appointed by Mayor Arrigo to a different position with corresponding salary increases, Capizzi allegedly repeatedly influenced the distribution of salaries in such a way as to ensure that he and a colleague, Doherty, would be paid more than McCormick at any time. Id. ¶¶ 42-49. He controlled and changed the comped time policy, allegedly enforcing it selectively against McCormick and exempting others at his discretion. Id. ¶¶ 27-28, 33-34, 75-80, 136-38, 222.

Considering the totality of Capizzi's alleged involvement in day-to-day operations and "direct participation in creating or adopting the unlawful pay practices," see Manning, 725 F.3d at 47, the court finds Capizzi is sufficiently alleged to be an employer for liability under MEPA.

15

### 3. Immunity From Invasion of Privacy Claim

McCormick's invasion of privacy claim (Count VIII) against the City is brought under M.G.L. c. 214, § 1B, which provides: "A person shall have a right against unreasonable, substantial or serious interference with his privacy." Defendants argue that this claim should be dismissed because intentional tort claims cannot be brought against public employers. Defs.' Mem. at 8 [Doc. No. 18]. McCormick fails to respond, and thus any opposition to this argument is deemed waived. See Schneider v. Local 103 I.B.E.W. Health Plan, 442 F.3d 1, 3 (1st Cir. 2006).

Under the Massachusetts Tort Claims Act, immunity from suit against "public employers" is waived under limited circumstances. M.G.L. c. 258, § 2. But that waiver does not apply to "any claim arising out of an intentional tort," which expressly includes "invasion of privacy" claims. Id. § 10(c). "Public employer" is defined as "any county, city, town, educational collaborative, or district . . . which exercises direction and control over the public employee." Id. § 1. In other words, invasion of privacy claims may not be brought against Massachusetts public employers.

The City is a public employer under the statute, see id., and thus the invasion of privacy claim against it is barred.

## III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. No. 17] is GRANTED as to Count VIII against the City and DENIED in all other respects.

IT IS SO ORDERED.

February 12, 2025                              /s/ Indira Talwani
                                               United States District Judge